**[J-20-2025] [MO: Brobson, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | |
|---|---|
| PUNXSUTAWNEY HUNTING CLUB, INC., AND PITCH PINE HUNTING CLUB, INC., | : No. 23 WAP 2023 |
| | : |
| | : Appeal from The Order of the |
| Appellants | : Commonwealth Court entered |
| | : September 29, 2023, at No. 456 MD |
| | : 2021. |
| v. | : |
| | : ARGUED: April 9, 2025 |
| | : |
| PENNSYLVANIA GAME COMMISSION, AND MARK GRITZER, IN HIS OFFICIAL CAPACITY AS AN OFFICER OF THE PENNSYLVANIA GAME COMMISSION, | : |
| | : |
| | : |
| | : |
| Appellees | : |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                **DECIDED: JULY 21, 2026**

For the reasons that the Majority thoroughly and convincingly explains, Article I, Section 8 of Pennsylvania's Constitution affords greater privacy protections than the Fourth Amendment to the United States Constitution, and our *Commonwealth v. Russo*[1] precedent must be reversed.[2]

I write separately to address two points of divergence that remain, notwithstanding my agreement with that important holding.

---

[1]     934 A.2d 1199 (Pa. 2007).

[2]     Maj. Op. at 76.

First, while I agree that the Game and Wildlife Code's[3] "Entry Statutes"[4] are facially unconstitutional, I differ with the Majority's rationale. The Majority holds that the "scope of the protection afforded under Article I, Section 8 to a landowner's open fields only extends to private land located beyond the curtilage over which the landowner has demonstrated a reasonable and legitimate expectation of privacy by taking sufficient steps to exclude intruders therefrom."[5] The Majority maintains that society would recognize privacy protections only for those who have "taken steps to notify the public that the land is private and that they should not intrude thereon without permission."[6] I

---

[3]    *See* 34 Pa.C.S. §§ 101-2965 ("the Game and Wildlife Code" or "the Code").

[4]    34 Pa.C.S. §§ 303(c), 901(a)(2).

[5]    Maj. Op. at 80. The Majority correctly determines that the Punxsutawney Hunting Club has established an expectation of privacy that society would deem reasonable and has demonstrated that the Entry Statutes are unconstitutional. *Id.* I add that, independent of a landowner's state constitutional rights, even if the Punxsutawney Hunting Club could not demonstrate an expectation of privacy, the Entry Statutes would be in constitutional peril. In *United States v. Jones*, 565 U.S. 400 (2012), the United States Supreme Court held that law enforcement officers' placement of a GPS device on a vehicle violated the Fourth Amendment. *Id.* at 402-03. *Jones* held that there are two ways to invoke the protections of the Fourth Amendment. A person can demonstrate an expectation of privacy in the area searched. Alternatively, a person can invoke a trespass theory, which affords the right to challenge a search or seizure when a government agent "physically occupied private property for the purpose of obtaining information." *Id.* at 404-05. Because the Entry Statutes authorize such a trespass, they likely are unconstitutional under *Jones* and the Fourth Amendment, as well as under Article I, Section 8.

The Majority opines that *Jones* has no application here because a law enforcement officer's warrantless entry onto land would not satisfy the elements of Pennsylvania's defiant trespass statute. *See* Maj. Op. at 80-81 n.24. I disagree. The *Jones* Court's trespass theory had nothing to do with whether the law enforcement officer was susceptible to criminal prosecution or whether a person raising a Fourth Amendment claim could allege violation of a criminal statute. Trespass was the principle recognized by the *Jones* Court as a vehicle that could be used to establish a violation of Fourth Amendment rights. That a law enforcement officer's action does not constitute a crime has no bearing upon the trespass theory applied by the *Jones* Court, a theory that likely would prohibit the warrantless entries that the Code authorizes.

[6]    Maj. Op. at 80.

believe that Pennsylvania's Constitution embraces a broader privacy entitlement. Landowners reasonably may expect that their land is protected against arbitrary and warrantless governmental entries. The right does not depend upon whether one adorns one's land with flimsy paper signs or splatters purple paint on a handful of trees.

Second, I am unable to join in the Majority's decision to uphold the constitutionality of 34 Pa.C.S. § 901(a)(8). That provision of the Game and Wildlife Code bestows upon game wardens the "power and duty" to search a hunter's private effects and containers without probable cause and without a search warrant.[7] This statutory authorization of suspicionless and warrantless searches is unconstitutional.

## I.

The open fields doctrine may bring to mind images of forested tracts, expansive farms, or isolated game lands.[8] But, for constitutional purposes, open fields are not limited to such bucolic settings. Any spaces owned by a landowner that extend beyond the house and its curtilage constitute open fields.[9] The protections afforded to open fields under Article I, Section 8 of the Pennsylvania Constitution apply as much to a one-acre plot in a suburban borough as they do to a rural one-hundred acre tract. The owner of the latter might believe it prudent to post "No Trespassing" signs on trees surrounding the property. The owner of the former would never think to do so. Both owners possess

---

[7] *Id.* at 81.

[8] *See, e.g.*, *Oliver v. United States*, 466 U.S. 170, 173 (1984) (farmland); *Russo*, 934 A.2d at 1200-01 (hunting camp); *State v. Bullock*, 901 P.2d 61, 64 (Mont. 1995) (hunting cabin surrounded by forest); *State v. Dixson*, 766 P.2d 1015, 1016 (Or. 1988) (heavily forested land accessible only on foot). As the Majority notes, the open fields doctrine flows from the pen of Holmes himself, who thought it "as old as the common law." *Hester v. United States*, 265 U.S. 57, 69 (1924). *See* Maj. Op. at 4.

[9] *See Oliver*, 466 U.S. at 178 (indicating that the open fields doctrine encompasses those outdoor areas owned by a landowner "except in the area immediately surrounding the home"); *see also Bullock*, 901 P.2d at 70 ("it appears that if an area is not curtilage, it is an open field").

open fields susceptible to warrantless law enforcement entry. Yet, according to the Majority, only the owner of the latter tract would have the right to prevent such unlawful entry. I disagree, as there is no difference between the two for purposes of constitutional privacy analysis.

Consider a hypothetical. A husband and a wife own a nine acre tract of land. Imagine that the property is square-shaped, with three rows of one acre plots. On the northern center acre sits the family home. Just south of the house, in the acre at the center of the square and outside of the house's curtilage, is a swimming pool. The remaining acres are covered sparsely in trees. The property is neither fenced nor walled. The trees are neither painted purple nor posted with signage. The husband and wife enjoy floating privately in their pool on warm summer evenings. Under the Majority's approach, this couple is entitled to no constitutionally protected privacy unless they post signs on the trees surrounding their pool. If the Majority is correct, a law enforcement officer can walk right onto their property, surveil at will, and even take photographs of the couple enjoying their time together in the pool—all without probable cause or a search warrant. This does not comport with the heightened expectation of privacy that Pennsylvanians enjoy under our Constitution. The pool-floating couple's assertion of privacy is as reasonable as that asserted by the Punxsutawney Hunting Club in this case; indeed, moreso.[10]

---

[10] The Majority suggests that landowners such as the pool-floating couple or the owner of a one-acre suburban lot may one day be able to demonstrate a reasonable expectation of privacy in their lands, even though they have not posted signs or painted any of their trees. *See* Maj. Op. at 80-81 n.24. The Majority declines to address such circumstances, choosing instead to "resolve only the question of whether the Hunting Clubs here have done so." *Id.* In the end, I believe the Majority offers these landowners false hope; their path to establishing an expectation of privacy is foreclosed by the Majority's conclusion that society would recognize privacy protections "only" for those who have "taken steps to notify the public that the land is private and that they should not intrude thereon without permission." *Id.* at 80. This conclusion unnecessarily limits the (continued…)

Privacy rights cannot and do not depend upon a landowner's decision or ability to staple signs to a tree or to erect fences. To impose such requirements is to ignore the fact that each home, property, usage, and terrain is different. Each implicates concerns of its own, which are necessarily idiosyncratic. Because the Majority's approach unnecessarily will abridge landowners' privacy rights, it will likely spawn suppression litigation in our trial courts. Fencing often is unaffordable or even impossible on large plots, or across difficult terrains and topographies. Privacy rights are not enjoyed only by those who can afford or manage to fence their entire property. Does a landowner who uses chain link fence, which creates no visual barrier to the property, have a greater claim to privacy than the person who puts up no fence at all, merely because the former has used some form of fencing? How many signs must one nail to a tree in order to safeguard one's expectation of privacy? For the one-acre suburban plot, is one sign enough? Two? This arbitrary bifurcation of privacy rights will compel law enforcement officers to make rapid, on-the-beat determinations of whether a landowner has undertaken sufficient efforts to ensure his privacy. Mistakes will lead to trespass accusations and unlawful seizures of evidence. Instead of inducing law enforcement officers to risk such errors, and instead of separating property owners into the haves and the have-nots, we should demand of our government agents what our Constitution requires: get a search warrant.

A landowner either has an expectation of privacy or he does not. Privacy rights do not exist only for those who take proactive steps to keep the government (and others) out. A homeowner is not required to shut his front door in order to expect privacy in his home. A woman is not required to close the zipper on her purse. A cell phone user is

expectation of privacy to the Appellants' class of landowners. Resolution of this case does not require such a limitation, a limitation that erects an insurmountable barrier to any who maintain a legitimate expectation of privacy in their land, even if they have not "taken steps to exclude intruders therefrom." *Id.*

not required to lock his device lest police officers root through his files. Such efforts may be well-advised, even intuitive. But they are not constitutional prerequisites. The yardstick for the right of privacy is not how loudly one announces one's expectation of it.

The Majority correctly invalidates the Entry Statutes. But its erroneous limitation regarding who can assert privacy rights will have repercussions beyond this case. Those who post signs, or who fence their boundaries, can rest assured that no law enforcement officer will enter their property without a search warrant. But today's holding offers no solace to those who own open fields but have not satisfied the Majority's privacy protection requirements. Unless and until landowners outwardly proclaim their privacy through signs, paint, or fences, they can expect no privacy, and law enforcement officers freely can enter their lands without search warrants. Article I, Section 8 cannot, and does not, countenance such a dichotomy of privacy rights.

## II.

The Majority holds that, unlike the Entry Statutes, Section 901(a)(8) of the Game and Wildlife Code passes constitutional muster, because "nothing in the text of Section 901(a)(8) . . . permits the [Game] Commission's officer's, employees, and representatives to enter private land, posted or otherwise."[11] I disagree. The text of the Game and Wildlife Code unambiguously permits game wardens or law enforcement officers to enter private land in order to conduct nearly boundless administrative searches, and these are unconstitutional.

Pennsylvania's Game and Wildlife Code vests "ownership, jurisdiction over and control of game or wildlife" in a "Commission."[12] The Commission is bound by statute to "protect, propagate, manage and preserve the game or wildlife of this Commonwealth

---

[11]    Maj. Op. at 81.

[12]    34 Pa.C.S. § 303.

and to enforce, by proper actions and proceedings, the laws of this Commonwealth relating thereto."[13] The Commission is empowered to set hunting seasons, select taking limits, declare or repeal declarations of open season hunting, increase or reduce bag or possession limits, define geographical parameters for hunting, fix the type and number of equipment to be used for hunting, limit the number of hunters permitted to hunt or trap within specific geographical parameters, govern the use of recorded or amplified game calls, classify wild birds and animals, prohibit the import or export of species of birds or animals that it deems dangerous to people or to the environment, manage the lands and waters within its control, collect and classify data, and serve "sportsmen by preserving and promoting our special heritage of recreational hunting and furtaking" by operating in a manner that affords "adequate opportunity" to hunt and trap.[14] The Commission is empowered to "[t]ake any necessary action to accomplish and assure the purposes"[15] of the Game and Wildlife Code.

In addition to assigning this broad set of responsibilities to the Commission, the Game and Wildlife Code also provides far-reaching enforcement powers to "[a]ny officer whose duty it is to enforce" the Code, or any officer "investigating any alleged violation" of the Code.[16] Section 901(a)(8) of the Code confers upon any officer responsible for enforcing the Game and Wildlife Code the "power and duty to:"

> [c]onduct administrative inspections of persons, licenses and permits, firearms, ammunition and other implements of taking, game bags, game, meat poles, tags, clothing, waterfowl blinds, decoys, tree stands, immediate hunting locations, or any means of transportation or its attachments used as blinds or as hunting locations, and any coolers or containers possessed

---

[13]   *Id.* at 322(a).

[14]   Id. §§ 322(c)(1)-(11), (13).

[15]   Id. § 322(c)(12).

[16]   *Id.* § 901(a).

at a hunting location when prima facie evidence of hunting exists. Any officer conducting an administrative inspection shall, if any person is present, present a badge or other means of official identification and state the purpose of the inspection.[17]

Contrary to the Majority's reading, this section of the Game and Wildlife Code permits officers to enter any land or open field in order to "[c]onduct administrative inspections." Game wardens and law enforcement officers are licensed by the Code to enter private property and search through clothing, vehicles, coolers and other closed containers, and hunting blinds or structures, as long as there is reason to believe that a person is hunting, even absent any suspicion whatsoever that the hunting is illegal. These statutory powers implicate the same privacy concerns as the Entry Statutes. They must meet the same fate.

Both Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution require a search warrant before police officers can search a person or seize his belongings.[18] Issuance of a search warrant means that "police have convinced a neutral magistrate upon a showing of probable cause, which is a reasonable belief, based on the surrounding facts and totality of circumstances, that an illegal activity is occurring or evidence of a crime is present."[19] "[E]ven absent probable cause, some searches without warrants do not violate state or federal constitutional privacy rights."[20] One such exception is an administrative search, "which does not always require a showing of probable cause."[21] "In the name of protecting

---

[17]     *Id.* § 901(a)(8).

[18]     *Commonwealth v. Petroll*, 738 A.2d 993, 998 (Pa. 1999) (citation omitted).

[19]     *Id.*

[20]     *Id.* at 999 (citations omitted).

[21]     *Id.* at 1000 (citations omitted).

the public's welfare, the government often weaves an intricate web of regulatory scrutiny"[22] to oversee businesses or activities that may pose a danger to the public. Businesses or activities of this type historically have been subject to scrutiny, "have little or no expectation of privacy," and, consequently, expect to be "subject to warrantless administrative searches"[23] in the normal course of operations. Such closely-regulated industries include solid waste management,[24] automobile junk yards,[25] mining,[26] firearm dealers,[27] and alcohol distilling and distribution.[28]

In *New York v. Burger*, the Supreme Court of the United States promulgated a three-pronged approach for ascertaining the reasonableness of a warrantless search of a closely regulated industry:

> First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made . . . .
>
> Second, the warrantless inspection must be "necessary to further [the] regulatory scheme". . . .
>
> Finally, the "statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." In other words, the regulatory statute must perform two basic functions of a warrant: it must advise the owner of the [] premises

---

[22]     *Id.*

[23]     *Id.* (citations omitted).

[24]     *See Department of Environmental Resources v. Blosenski Disposal Service*, 566 A.2d 845, 848 (Pa. 1989).

[25]     *See New York v. Burger*, 482 U.S. 691, 712 (1987).

[26]     *See Donovan v. Dewey*, 452 U.S. 594, 606 (1981).

[27]     *See United States v. Biswell*, 406 U.S. 311, 316-17 (1972).

[28]     *See Colonnade Catering Corp. v. United States*, 397 U.S. 72, 76 (1970).

that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.[29]

Such a statutory scheme must be "sufficiently comprehensive and defined[, so] that the owner of the commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes."[30]  The searches must be "carefully limited in time, place, and scope."[31]

Hunting is demonstrably different from those businesses and activities that have historically been so heavily regulated that habitual governmental inspection routinely can (and should) be expected.  For one thing, Section 901(a)(8) of the Code authorizes administrative inspections not on the commercial premises of a business, but upon the personal effects and property of a private citizen.  For another, hunting on privately owned land is an entirely different animal (so to speak) from the historical anticipation of governmental regulation and inspection expected in industries or activities that raise safety risks to the public at large.  Nonetheless, even assuming, *arguendo*, that hunting is a closely regulated industry, Section 901(a)(8) plainly fails to satisfy the final *Burger* prong.

Section 901(a)(8) does not in any constitutionally meaningful way "limit the discretion of the inspecting officers."[32]  The warrantless searches authorized by Section 901(a)(8) are neither "comprehensive and defined,"[33] nor "carefully limited in time, place, and scope."[34]  An "officer whose duty it is to enforce [the Code] or any officer investigating

---

[29]     *Burger*, 482 U.S. at 702-03 (citations omitted).

[30]     *Id.* at 705 n.16 (citations omitted).

[31]     *Biswell*, 406 U.S. at 315.

[32]     *Burger*, 482 U.S. at 703.

[33]     *Id.* at 705 n.16 (citations omitted).

[34]     *Biswell*, 406 U.S. at 315.

any alleged violation of [the Code]"[35] is not limited to any location or geographical parameters. Contrary to the Majority's interpretation, Section 901(a)(8) clearly permits, if not encourages, officers to enter private property. So long as that officer believes that someone is hunting—not even hunting illegally—Section 901(a)(8) authorizes that officer to enter private land and search nearly any person, place, item, or container located on the property, all without a warrant or even the barest suspicion of illegal activity. Nor does the section impose any time constraints. Nothing in Section 901(a)(8) circumscribes these searches by time of day or duration. Section 901(a)(8) does nothing to curtail an officer's discretion. While Section 901(a)(8) identifies specific items and areas that may be searched,[36] it also endows officers with discretion to inspect "other implements of taking," to search "any means of transportation or its attachments," and to open and rummage through "any coolers or containers possessed at a hunting location."[37] In sum, when an officer possesses a *prima facie* belief that a person is hunting, that officer is entitled by Section 901(a)(8) to search any item, place, container, or vehicle on the property, at any time of the day, and for as long the officer deems necessary. Because it imposes no meaningful constraints upon the discretion of the officers enforcing the Code, Section 901(a)(8) fails to satisfy the *Burger* test. Accordingly, it "clearly, plainly, and palpably"[38] violates the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

\* \* \*

---

[35] 34 Pa.C.S. § 901(a).

[36] *See id.* § 901(a)(8) (allowing inspections of "persons, licenses and permits, firearms, ammunition . . ., [and] game bags, game, meat poles, tags, clothing, waterfowl blinds, decoys, tree stands, [and] immediate hunting locations").

[37] *Id.*

[38] *Commonwealth v. Hunte*, 337 A.3d 483, 497 (Pa. 2025).

For these reasons, I join Parts I, II(A), II(B), and III of the Majority Opinion.  I concur in the result of Part II(C) with regard to the unconstitutionality of the Entry Statutes.  As for the Majority's finding that Section 901(a)(8) is constitutional, I respectfully dissent.

Justice McCaffery joins this concurring and dissenting opinion.